COMMONWEALTH of Pennsylvania, Appellant,

v.

Mark DeHART, Appellee.

Commonwealth of Pennsylvania, Appellant,

v.

Ricky Keister, Appellee.

Superior Court of Pennsylvania.

Submitted Aug. 16, 1999.

Filed Jan. 19, 2000.

Before CAVANAUGH, LALLY–GREEN and BROSKY, JJ.

BROSKY, J.

¶ 1 This is an appeal by the Commonwealth from an order granting Appellees' suppression motion. The Commonwealth raises two questions for our consideration, which we restate as follows: when a police vehicle pulls alongside a vehicle which was already stopped of its own accord, is the ensuing questioning of the occupants a mere encounter or an investigative detention; does an investigative detention occur when a police officer gets out of his vehicle and approaches a vehicle, which was stopped of its own accord, to converse with the occupants? We affirm.

¶ 2 The facts relevant to our decision today, set forth consistent with the standard of review recited *infra*, is as follows: shortly after midnight on February 8, 1998, Pennsylvania State Troopers Michael Hutson and James Hansel were on patrol when they received a radio report that there was a "suspicious vehicle" in the village of New Columbia and that the vehicle might be a blue Camaro or Trans Am. The radio report did not cite a source for the information and stated only that the vehicle was being driven in a slow fashion. Upon arriving on the main street in New Columbia, the troopers came upon a Trans Am moving in front of them and then observed the vehicle turn around. After turning their vehicle to follow the Trans Am, the troopers found the vehicle pulled up to the berm in front of a house with the engine still running.[1] They also observed an individual standing outside the vehicle in apparent conversation with one of the occupants. The troopers pulled their vehicle up next to the subject vehicle, whereupon Trooper Hutson, sitting in the passenger seat, rolled down the window—prompting the driver of the vehicle, Appellee Keister, to do the same—and asked him "what's going on here?" Mr. Keister, according to Trooper Hutson, responded in a soft-spoken manner and avoided eye contact with him. Mr. Keister's actions aroused the suspicions of Trooper Hutson, who then stated to Trooper Hansel, "something's not right here, . . . I'm going to get out of the car and see what's going on here." Trooper Hutson then proceeded to get out of the cruiser, as did Trooper Hansel.

¶ 3 Trooper Hutson went around to the passenger side of the vehicle while Trooper Hansel began questioning Keister. Upon conversing with Keister at closer range, Trooper Hansel was able to smell alcohol on Keister's breath. It also appeared to Trooper Hansel that Keister might not be twenty-one years of age. Trooper Hansel then asked Keister for his driver's license, which, upon inspection, confirmed the fact that Keister was under 21 years of age. Trooper Hansel then asked Mr. Keister to exit the vehicle and directed him through two field sobriety tests, both of which he failed.

¶ 4 Meanwhile Trooper Hutson was busy with Appellee Mark DeHart, who had been situated in the passenger seat of the Trans Am. After speaking briefly with DeHart, Trooper Hutson was able to detect alcohol on his breath as well. DeHart was asked to exit the vehicle and was told that he would be transported to Evangelical Hospital. Trooper Hutson then subjected Mr. DeHart to a pat-down search. While conducting the pat-down search Trooper Hutson was able to feel a marijuana pipe that was "clearly noticeable to [his] touch." Trooper Hutson reached into DeHart's pocket and removed the pipe. A bag of substance suspected of being marijuana was also discovered. A field test was then performed on the substance, which provided a positive test result for marijuana. Both Appellees were arrested and taken to the hospital for analysis of blood alcohol content. Charges were later filed against both parties.

¶ 5 Responding to their arrest, Appellees filed an omnibus motion seeking suppression of all evidence resulting from the police encounter. A hearing on the suppression motion was held on December 3, 1998. After the conclusion of the hearing, the Honorable Louise Knight granted Appellees' motion and ordered the evidence resulting from the encounter suppressed. The Commonwealth then filed the within appeal.

¶ 6 In reviewing a Commonwealth appeal from a suppression order:

---

1. Both Appellees testified that their vehicle was situated between two other vehicles so that there was a vehicle both in front of, and behind, their own. The vehicles were described as a white van, ten to thirteen feet in front, and a red car approximately seven feet to the rear.

we follow a clearly defined standard of review and consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted.... The suppression court's findings of fact bind an appellate court if the record supports those findings.

*Commonwealth v. Nester*, 551 Pa. 157, 709 A.2d 879, 880–81 (1998). (Citations omitted.)

 ¶ 7 The trial court states that determining the propriety of the suppression begins with an analysis of the tip received by the police. The court then concludes that the tip received could not support a *Terry*[2] stop. We agree with the trial court that the tip would not support a *Terry* stop. Unfortunately, although we agree with the trial court's assessment in this regard, our agreement renders the issue a "red herring." It is clear that the troopers did not possess information that would justify a stop. However, this is relevant only to the extent the troopers "stopped" Appellees. Since the car the Appellees were situated in was already stopped when the troopers pulled up, Appellees were not "stopped" for search and seizure purposes. Nevertheless, an encounter or interaction ensued that escalated into a full arrest and must be scrutinized to see if it passes constitutional muster.

 ¶ 8 "Interaction" between citizens and police officers, under search and seizure law, is varied and requires different levels of justification depending upon the nature of the interaction and whether or not the citizen is detained. Such interaction may be classified as a "mere encounter," an "investigative detention," or a "custodial detention." A "mere encounter" can be any formal or informal interaction between an officer and a citizen, but will normally be an inquiry by the officer of a citizen. The hallmark of this interaction is

that it "carries no official compulsion to stop or respond." *Commonwealth v. Allen*, 452 Pa.Super. 200, 681 A.2d 778, 782 (1996) (citing *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) ).

 ¶ 9 In contrast, an "investigative detention," by implication, carries an official compulsion to stop and respond, but the detention is temporary, unless it results in the formation of probable cause for arrest, and does not possess the coercive conditions consistent with a formal arrest. Since this interaction has elements of official compulsion it requires "reasonable suspicion" of unlawful activity. *Id.* In further contrast, a custodial detention occurs when the nature, duration and conditions of an investigative detention become so coercive as to be, practically speaking, the functional equivalent of an arrest. *Id.*

¶ 10 As indicated above, it appears undisputed that, when the interaction between the troopers and Appellees began, there was a lack of reasonable suspicion that would justify either a traffic stop or an investigative detention. However, as the Commonwealth has suggested, the vehicle Appellees were occupying was already stopped when the troopers pulled alongside it. We are unaware of any search and seizure law that treats a police officer approaching a stopped vehicle as a "traffic stop." Further, since a mere encounter between police officer and citizen requires no suspicion at all, the key to analyzing the within case is a determination of the point in time when Appellees were subjected to an investigative detention and whether, at that time, there existed sufficient justification for that classification of a detention.

¶ 11 After the initial questioning of Appellee Keister by Trooper Hutson from the police cruiser, Trooper Hansel exited the police car and began questioning Keister while Hutson began questioning DeHart. Almost immediately thereafter, Trooper

**2.** *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

Hansel was able to detect an odor of alcohol. Appellee Keister was then asked for his driver's license, which confirmed that he was, in the least, drinking underage and possibly had been operating a motor vehicle under the influence of alcohol. At that point Appellee Keister was asked to exit the vehicle. The trial court states that "when the officers then asked the Defendants to get out of the car, matters had clearly escalated to an investigatory detention for which there had to be reasonable suspicion." Trial Ct. Op. at p. 5. We agree. However, at the time the Appellees were asked to step out of the vehicle, there was at least reasonable suspicion of criminal activity, namely underage drinking and, possibly, driving while under the influence, if not probable cause for an arrest. Thus, to affirm the order of suppression the focus must be upon a point earlier in time.

■ ¶ 12 In contrast to the suspicion acquired during the face-to-face encounter, we are of the opinion that at the time the officers exited their cruiser and began a more intensive questioning of Appellees, they lacked a reasonable suspicion of criminal activity such as would support an investigative detention. As indicated by the trial court, the tip received over the police radio was too vague, and unsupported by indicia of reliability, to provide reasonable suspicion of criminal activity for an investigative detention. Additionally, the initial questioning of Appellees yielded no tangible information that would provide "reasonable suspicion" of criminal activity. Rather, as testified to by Trooper Hutson, he believed that Keister was acting suspiciously because he avoided eye contact and was speaking softly. As indicated by the trial court, *Commonwealth v. Sierra*, 555 Pa. 170, 723 A.2d 644 (1999), reasonably suggests that a police officer's assessment that the occupants of a vehicle appear nervous does not provide reasonable suspicion for an investigative detention.

¶ 13 Thus, it seems to us the key to the present case is whether or not Appellees were subjected to an investigative detention at the time the Troopers alighted from their vehicles and began a more intensive interrogation of Appellees. If they were, then the detention would be unsupported by reasonable suspicion and would run afoul of our search and seizure law. If they were not, however, and the interaction was still a "mere encounter" for search and seizure purposes, then we would be inclined to find the subsequent searches valid because the Troopers quickly developed the required reasonable suspicion of criminal activity.

■ ¶ 14 In *Sierra*, our Supreme Court recited the test to determine whether individuals interacting with police officers have been subjected to an "investigative detention." The test is whether, considering all the circumstances surrounding the encounter, the police conduct would communicate to a reasonable person that the person was not free to decline the officers' request or otherwise terminate the encounter. *Id.*, citing *Commonwealth v. Lewis*, 535 Pa. 501, 636 A.2d 619 (1994). Turning to the present case, we ask the rhetorical question, would reasonable persons, faced with a situation where State Troopers pull up next to their car, engage them in questioning and then observe the troopers exit the vehicle and approach both windows, feel they are free to decline the officer's requests and/or terminate the encounter? We believe the answer is no.

¶ 15 In reality, it is quite likely that Appellees did not, nor would reasonable persons in their situation, feel free to disregard the troopers' initial inquiries when they pulled alongside Appellees' vehicle. Similarly, it is quite likely that a reasonable person in that situation would not feel free to simply drive away from the troopers.[3] We acknowledged in *Commonwealth*

---

**3.** Indeed, this was their testimony, and being candid about it, there is no reason to disbelieve their testimony.

*v. Yashinski*, 723 A.2d 1041 (Pa.Super.1998), that:

> The overwhelming majority of lay people do not feel free to simply ignore a police officer's questions and continue driving along. We recognized a similar concept in *Commonwealth v. Zogby*, 455 Pa.Super. 621, 689 A.2d 280 (1997), where we stated "[t]he reality of the matter is that when a police officer requests a civilian to do something, even something as simple as 'move along,' it is most often perceived as a command that will be met with an unpleasant response if disobeyed." *Id.*, 689 A.2d at 282.
>
> No less an authority than Justice Stevens of the United States Supreme Court has stated "[r]epeated decisions by ordinary citizens to surrender that interest [the right to refuse consent to a search] cannot be satisfactorily explained on any hypothesis other than an assumption that they believed they had a legal duty to do so." *Ohio v. Robinette*, 519 U.S. 33, 48, 117 S.Ct. 417, 425, 136 L.Ed.2d 347 (1996) (Dissenting Opinion). These observations demonstrate that a police officer need not officially "stop" a vehicle to effectuate the investigative purpose, it is enough if they ask a question of a motorist because, except for the brashest of motorists, the ordinary motorist will feel compelled to stop and respond.

Nevertheless, our search and seizure law has never been so strictly construed as to prevent police officers from making a brief inquiry of people they come across on a street corner, and, theoretically, there is no reason to treat the brief initial inquiry here differently merely because it occurred while all parties were in motor vehicles. The above notwithstanding, however, while the initial interaction of pulling up alongside the vehicle and making a cursory inquiry might be thought of as a reasonably innocent and informal encounter, when the troopers alighted from the vehicle and approached Appellees' vehicle the feeling of the encounter certainly would have elevated to a point where reasonable persons would not have felt free to drive away or refuse to answer their questions. Indeed, given the testimony of the Appellees regarding the positioning of the vehicles, they could not have driven away had they wanted too.

¶ 16 Further, the above is consistent with the thought process of the Troopers. Having pulled up and making cursory inquiries of the occupants, Trooper Hutson was suspicious and wanted to find out what was going on. In essence, by deciding to exit the vehicle and approach its occupants, he chose to escalate the encounter to afford greater investigation, which, of course, is consistent with the purpose of an investigative detention. Thus, under applicable guidelines the encounter at that point became an investigative detention. As indicated above, there was a lack of reasonable suspicion at that juncture, a necessary prerequisite for a legal investigative detention.

¶ 17 We believe the above conclusion is buttressed by the decisions in *Commonwealth v. Wilmington*, 729 A.2d 1160 (Pa.Super.1999) *en banc*, and *Commonwealth v. Vasquez*, 703 A.2d 25 (Pa.Super.1997). Both *Wilmington* and *Vasquez* were drug interdiction cases involving the practice of boarding a commercial passenger bus and questioning the passengers, particularly those fitting the "drug courier" profile. In both cases, narcotics agents boarded a passenger bus, at either a scheduled stop or at a toll booth plaza, with the bus driver's permission and began a brief questioning of the passengers, moving down the aisle until each passenger had been covered. This court concluded that no reasonable passengers, subjected to this questioning, would have felt that they were not being restrained. *See Wilmington*, 729 A.2d at 1170–71; *Vasquez*, 703 A.2d at 30–31.

¶ 18 We further believe that the Pennsylvania Supreme Court's decisions in *Commonwealth v. Lewis*, 535 Pa. 501, 636

A.2d 619 (1994), and *Commonwealth v. Sierra*, 555 Pa. 170, 723 A.2d 644 (1999), support our conclusion. In *Lewis*, our Supreme Court considered an encounter at an Amtrak station where officers approached two travelers who, again, fit a drug courier profile. The officers, dressed in plain clothes, approached the men, identified themselves and began asking a few questions of them. As the men provided answers that raised suspicions, coupled with a nervous look, the encounter escalated until a search took place that resulted in the finding of a handgun. An additional search yielded a packet of cocaine. The Supreme Court reversed the decision of this court, which upheld the trial court's denial of a suppression motion. The Supreme Court concluded that, considering the totality of the circumstances, the encounter demonstrated a show of authority which constituted a restrain on the individuals' liberty. *Lewis*, 636 A.2d at 623.

¶ 19 In *Commonwealth v. Sierra, supra*, our Supreme Court considered a search that occurred after a legal stop for speeding. The officer decided to give Sierra a written warning. After handing Sierra the warning, the officer asked him if there was anything illegal in the car. Sierra responded no, and then asked the officer if he would like to look. The officer accepted the invitation but asked Sierra to first exit the vehicle and submit to a pat-down search. During the pat-down search, a gun was discovered which ultimately led to a conviction on firearm offenses. The Supreme Court affirmed the decision of this court reversing Sierra's conviction. Of importance to us is the Court's conclusion that a reasonable person would not feel free to leave the scene of a traffic stop while police continued questioning them.

¶ 20 Although, as admitted above, in our case the Appellees were not "stopped" for search and seizure purposes, the perception remains essentially the same. Once subjected to questioning by police officers, "the overwhelming majority of lay people do not feel free to simply ignore a police officer's questions." *Commonwealth v. Yashinski, supra*, quoted with approval, *Commonwealth v. Wilmington, supra*, 729 A.2d at 1168–69. This is essentially true whether one has been pulled over, given a warning and handed back one's license and registration, whether one is asked questions as one proceeds through a toll booth, or whether police approach a stopped vehicle and begin questioning the occupants.

¶ 21 Consequently, given the above, we conclude that the trial court was correct in suppressing the evidence discovered as a result of the interaction in the within case.

¶ 22 Order affirmed.