J-A13028-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| WARREN GREENLEAF, | |
| Appellant | No. 1636 WDA 2013 |

Appeal from the Judgment of Sentence Entered September 11, 2013
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s): CP-02-CR-0007051-2012

BEFORE:  PANELLA, SHOGAN, and OTT, JJ.

MEMORANDUM BY SHOGAN, J.:                    **FILED JUNE 18, 2015**

Appellant, Warren Greenleaf, appeals from the judgment of sentence entered following his convictions of violations of the Pennsylvania Uniform Firearms Act[1] and defiant trespass.  We affirm.

The trial court summarized the factual and procedural history of this case as follows:

> On May 23, 2012 Zone 5, Pittsburgh Police Lieutenant, Reyne Kacsuta, was patrolling in the Garfield section of the [C]ity of Pittsburgh Allegheny County PA.  As she drove past 5402 Broad St., she saw a woman and three men on the front porch of an apartment building.  The police had received an anonymous citizen's complaint the day before of people trespassing on that property, gambling, and smoking marijuana.  Lt. Kacsuta decided to stop and investigate after observing a police car drove [sic] past without stopping.  As she exited the

_____

[1] 18 Pa.C.S. § 6101, *et seq*.

police car and approached the front of the apartment building the people on the porch jumped up and one said, "Okay we're going". Lt. Kacsuta testified that the actions of the people and their remark, "we're going" gave her reasonable suspicion that the people were trespassing.

When the Lieutenant asked the people to remain where they were, one person, later identified as Anthony Amato began talking and screaming. [Appellant] began to bang on the apartment's locked front door yelling for someone to let him inside the building, and a third individual started to run away. Fearing for her safety and because her backup had just begun to arrive, Lt. Kacsuta handcuffed [Appellant] and the remaining individuals until she finished her investigation. However, once she determined that [Appellant] and other individuals had no outstanding warrants, and would only be charged with a summary trespass, Lt. Kacsuta began to uncuff the detainees. [Appellant] had difficulty standing up and stated he had been shot. When Lt. Kacsuta and Officer McGee went to assist [Appellant], they saw a gun, in plain view, protruding from his pants pocket. [Appellant] was placed under arrest and charged with Violation of the Uniform Firearms Act, Person Not to Possess, use etc. a Firearm[;] Violation of the Uniform Firearms Act, Carrying a Firearm Without a License[;] and Defiant Trespass.

[Appellant's] firearm was a .38 caliber Colt Special revolver, tested and found to be in good working condition[.] Furthermore, [Appellant] did not have a license to carry the gun, nor could he obtain a license because of prior convictions. All the testimony from the Suppression hearing was incorporated in [Appellant's] non-jury trial.

[Appellant] was found guilty on all three counts and sentenced on September 11, 2013 to 4 to 8 years.

[Appellant] filed a timely appeal[.]

Trial Court Opinion, 10/14/14, at 2-3 (internal citations and footnotes omitted). Both Appellant and the trial court complied with Pa.R.A.P. 1925(b).

Appellant presents the following issue for our review:

Did [the] trial court err in denying [Appellant's] motion to suppress where police, acting on an anonymous tip, seized [Appellant] without the requisite reasonable suspicion to believe criminal activity was afoot?

Appellant's Brief at 4.

Appellant argues that Lieutenant Kacsuta violated his constitutional rights to be free from unreasonable searches and seizures when she stopped him without the requisite reasonable suspicion to believe he was engaged in criminal activity. Appellant's Brief at 11. Appellant contends that on the evening of the incident at issue, Lieutenant Kacsuta did not know whether the individuals encountered on the porch were the same individuals who were there the day before, when the anonymous complaint was made. *Id.* at 16. Thus, Appellant asserts, the day-old anonymous tip, in conjunction with the officer's observation that Appellant walked away from the porch when the officer approached, was insufficient to establish reasonable suspicion of criminal activity. *Id.* at 11. Because the officers recovered a firearm from Appellant's person pursuant to this alleged unlawful seizure, Appellant maintains that the firearm should have been suppressed. *Id.* at 19.

The standard of review an appellate court applies when considering an order denying a suppression motion is well established. An appellate court may consider only the Commonwealth's evidence and so much of the evidence for the defense as remains uncontradicted when read in the

context of the record as a whole. ***Commonwealth v. Russo***, 934 A.2d 1199, 1203 (Pa. 2007) (citing ***Commonwealth v. Boczkowski***, 846 A.2d 75 (Pa. 2004)). Where the record supports the factual findings of the trial court, the appellate court is bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. ***Id***. However, it is also well settled that an appellate court is not bound by the suppression court's conclusions of law. ***Id***. (citing ***Commonwealth v. Duncan***, 817 A.2d 455 (Pa. 2003)).

> With respect to factual findings, we are mindful that it is the sole province of the suppression court to weigh the credibility of the witnesses. Further, the suppression court judge is entitled to believe all, part or none of the evidence presented. However, where the factual determinations made by the suppression court are not supported by the evidence, we may reject those findings. Only factual findings which are supported by the record are binding upon this [C]ourt.

***Commonwealth v. Benton***, 655 A.2d 1030, 1032 (Pa. Super. 1995) (citations omitted). In addition, we are aware that questions of the admission and exclusion of evidence are within the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion. ***Commonwealth v. Freidl***, 834 A.2d 638, 641 (Pa. Super. 2003).

"'Interaction' between citizens and police officers, under search and seizure law, is varied and requires different levels of justification depending upon the nature of the interaction and whether or not the citizen is detained." ***Commonwealth v. DeHart***, 745 A.2d 633, 636 (Pa. Super.

2000). The three levels of interaction are: mere encounter, investigative detention, and custodial detention. *Id.*

> A mere encounter can be any formal or informal interaction between an officer and a citizen, but will normally be an inquiry by the officer of a citizen. The hallmark of this interaction is that it carries no official compulsion to stop or respond.
>
> In contrast, an investigative detention, by implication, carries an official compulsion to stop and respond, but the detention is temporary, unless it results in the formation of probable cause for arrest, and does not possess the coercive conditions consistent with a formal arrest. Since this interaction has elements of official compulsion it requires reasonable suspicion of unlawful activity. In further contrast, a custodial detention occurs when the nature, duration and conditions of an investigative detention become so coercive as to be, practically speaking, the functional equivalent of an arrest.

*Id.* (internal citations and quotation marks omitted).

> Reasonable suspicion exists only where the officer is able to articulate specific observations which, in conjunction with reasonable inferences derived from those observations, led him reasonably to conclude, in light of his experience, that criminal activity was afoot and that the person he stopped was involved in that activity. Therefore, this Court must make an objective inquiry, namely, whether the facts available to the officer at the moment of the [intrusion] warrant a man of reasonable caution in the belief that the action taken was appropriate.

*Commonwealth v. Plante*, 914 A.2d 916, 922 (Pa. Super. 2006) (internal citations and quotations omitted).

"To determine whether a mere encounter rises to the level of an investigatory detention, we must discern whether, as a matter of law, the police conducted a seizure of the person involved." *Commonwealth v. Reppert*, 814 A.2d 1196, 1201 (Pa. Super. 2002).

> To decide whether a seizure has occurred, a court must consider all the circumstances surrounding the encounter to determine whether the demeanor and conduct of the police would have communicated to a reasonable person that he or she was not free to decline the officer's request or otherwise terminate the encounter. Thus, the focal point of our inquiry must be whether, considering the circumstances surrounding the incident, a reasonable [person] innocent of any crime, would have thought he was being restrained had he been in the defendant's shoes.

*Id.* at 1201-1202 (internal citations and quotations omitted).

Lieutenant Kacsuta provided the following relevant testimony. Lieutenant Kacsuta was patrolling the area of Broad Street, in the Garfield area of the city on May 23, 2012. N.T., 5/16/13, at 6, 11. On May 22, 2012, the night before the incident at issue, the Zone 5 police station had received an anonymous complaint regarding individuals at 5402 Broad Street, who were trespassing, smoking marijuana, and shooting dice. *Id.* at 5-6. As a result, during her patrol on May 23, 2012, Lieutenant Kacsuta drove by 5402 Broad Street to observe the area. *Id.* at 6. Lieutenant Kacsuta saw one woman and three or four men on the porch to the apartment building at 5402 Broad Street. *Id.* She stated that as soon as she pulled up in a marked police car and started to get out, the individuals on the porch stood up and said "okay, we're going." *Id.* Lieutenant Kacsuta testified that response indicated to her that they were in fact trespassing. *Id.* Lieutenant Kacsuta described the subsequent developments as follows:

> [Lieutenant Kacsuta]: [Appellant] reached towards the door knob [of the apartment building door] which was locked, and he started yelling let me in, let me in, let me in. A woman came out of the second or third floor window and she started yelling

and I said everybody just sit down. I wanted everybody [to] just sit down on the porch.

At that point there was one other individual who I later identified as Anthony Amato, he was a little to the side of the porch, he was kind of standing in the yard. And he just started talking and screaming, which was a diversion – I believe was a diversion, he was trying to divert my attention.

* * *

And he just kept screaming. So, I'm telling everybody just sit down. And one of the men ran. He ran like off the porch towards me and then he turned to my left. I already had my taser out. I deployed my taser. He screamed, he fell on the ground. So now I have this guy who is diverting me, I have Anthony Amato who is diverting me, I have a woman and two other men on the porch.

* * *

[Counsel]: At this time, lieutenant, do you have any backup or are you by yourself?

[Lieutenant Kacsuta]: I was by myself.

[Counsel]: So with all this activity going on what do you do next?

[Lieutenant Kacsuta]: I'm directing everybody to sit down which [Appellant], the other individual and the woman sat on the porch. Amato, I had him lay down on the ground, he eventually complied. The other guy got away, he ran. He – the taser hit him, he fell to the ground, he got back up and he ran.

[Counsel]: Okay.

[Lieutenant Kacsuta]: At this point my sense was that I was in sort of an ambush type situation with this individual who ran because now I don't know where he went. So I have everybody sitting on the porch, and I had already radioed for backup when I was getting out of the car so other officers were coming.

* * *

When the first officer arrived on the scene, it was Officer Greg McGee, we just started handcuffing the people who were on the porch and I handcuffed [Appellant].

[Counsel]: At that time what was the basis for your handcuffing [Appellant] along with the other individuals?

[Lieutenant Kacsuta]: He was – my initial investigation was of the defiant trespass and because everybody got up to leave as soon as they saw a police car, I said okay, these individuals do not belong here so I'm going to investigate this as defiant trespass.

When [Appellant] tried to get into the building and he could not access it, that led me further to believe that he was in fact trespassing on this porch because he couldn't get in, and he was yelling to somebody to let him into the building. That's the crime that I was investigating.

Once all of this chaos happens with the running and I know that I am – that the initial complaint is drug dealing, trespass, gambling and I know that this area, this area -- this is in Garfield, it is a very violent high crime area. There is a lot of shootings, there is a lot of drug dealing, so that's kind of what I figured I had there. And my initial charge for [Appellant] was that he was trespassing.

[Counsel]: When all that activity was going on is it safe to say that you were in fear of your safety?

[Lieutenant Kacsuta]: Yes, I was.

[Counsel]: So, once you place [Appellant] in handcuffs along with I believe two other individuals what happened next?

[Lieutenant Kacsuta]: Other officers had arrived. We got everybody handcuffed, got everybody's name. We ran everybody for warrants to see if there were warrants for anybody. I realized I had not patted anybody down because I just wanted to get them handcuffed so we could all be safe. So at that point I was about to let [Appellant] go, went to stand him up, Officer McGee and I went to get him to stand up –

[Counsel]: Was he in handcuffs?

[Lieutenant Kacsuta]: He was handcuffed. We were going to stand him up, and I'm not sure at what point we were going to pat him down, if we were patting him down and letting him go, but the situation was calm, everything was in my mind at this point calm and somewhat resolved.

As we went to get [Appellant] up, told him to stand, he leaned over to his right. He said I can't stand up, I can't stand up, I got shot. Well, I didn't know when he got shot. I didn't know if he had just gotten shot. He said I got shot, I got shot, I can't stand up. And he very oddly leaned over to his right side. And so Officer McGee and I went to pick him up and he still kept leaning to his right, leaning to his right. As I stood him up I saw the handle of a gun sticking out of his pants pocket.

*Id.* at 6-12.

The record supports the conclusion that Lieutenant Kacsuta's initial interaction with the individuals on the porch began as a mere encounter. She approached the individuals merely for purposes of making inquiry. The reactions of the individuals in response to her approach resulted in her developing reasonable suspicion that they were involved in criminal activity. Specifically, the individuals started to leave as she approached, indicating that "we're leaving". Appellant was banging on the front door to the apartment building seeking access. One of the men started yelling and screaming and another charged off of the porch towards Lieutenant Kacsuta. Additionally, the individuals were in the same location that was the subject of a complaint the night before involving individuals trespassing, smoking marijuana, and gambling. This address was located in a high crime area of the city, where drug dealing and shootings are common. Thus, the totality

of the circumstances reasonably led Lieutenant Kacsuta to believe that the individuals, including Appellant, were involved in criminal activity. ***Plante***, 914 A.2d at 922. Accordingly, she was justified in detaining these individuals for purposes of investigating potential criminal activity.

We further note that, despite Appellant's claim, Lieutenant Kacsuta's reasonable suspicion that the individuals were involved in criminal activity was not based solely on the anonymous tip received by officers the night before. The previous complaint regarding criminal activity at this address was simply one factor in the totality of circumstances supporting her conclusion. Furthermore, it is of no relevance whether Appellant was one of the individuals trespassing at that address the night before. As noted, the totality of the circumstances reasonably led Lieutenant Kacsuta to believe that the individuals, including Appellant, were involved in criminal activity. ***Plante***, 914 A.2d at 922. As such, reasonable suspicion justified her seizure of these individuals for purposes of investigating criminal activity. The seizure of Appellant and the other individuals was lawful.

Having determined that the seizure of Appellant's person was lawful, we turn to consider the legality of the seizure of the gun on Appellant's person. The gun sticking out of Appellant's pants pocket came into plain sight while the officers were attempting to stand Appellant upright after he stated that he could not stand because he had been shot. We apply the

following test to determine whether a search falls within the plain view exception:

> For the exception to be present, initially, the officer must not have violated the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed. Moreover, two additional conditions must be satisfied to justify the warrantless seizure. First, the incriminating character of the item must be immediately apparent. Also, the officer must have a lawful right of access to the object itself.

*Commonwealth v. Turner*, 982 A.2d 90, 92 (Pa. Super. 2009) (quotations and citations omitted).

Here, the officers viewed the gun from a lawful vantage point. As stated, the officers had lawfully seized Appellant. The gun became apparent as the officers were helping Appellant to stand after he asserted that he could not do so because he had been shot. Additionally, the incriminating nature of the object was immediately apparent to Lieutenant Kacsuta, and she had a lawful right to access the firearm. Thus, a warrantless seizure of the gun was justified.

Accordingly, we conclude the suppression court did not err in finding Lieutenant Kacsuta had the necessary reasonable suspicion to detain Appellant. Additionally, because the gun was viewed in plain sight during the lawful detention, the officers properly seized it. Thus, the trial court did not err in denying Appellant's request to suppress this evidence.

Judgment of sentence affirmed.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>6/18/2015</u>