J-A06030-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| THAR SOLTANI, | |
| Appellee | No. 3739 EDA 2015 |

Appeal from the Order November 23, 2015
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0001970-2015

BEFORE:  PANELLA, SHOGAN, and RANSOM, JJ.

MEMORANDUM BY SHOGAN, J.:                      **FILED MAY 24, 2017**

Appellant, the Commonwealth of Pennsylvania, appeals from the November 23, 2015 order granting the suppression motion filed by Appellee, Thar Soltani.[1]  After careful review, we affirm.

The relevant facts and procedural history of this matter were set forth by the suppression court as follows:

---

[1]   The Commonwealth may appeal an interlocutory order suppressing evidence when it provides a certification with its notice of appeal that the order terminates or substantially handicaps the prosecution. ***Commonwealth v. Whitlock***, 69 A.3d 635, 636 n.2 (Pa. Super. 2013); Pa.R.A.P. 311(d) (commonly referred to as a ***Dugger*** certification; ***see Commonwealth v. Dugger***, 486 A.2d 382 (Pa. 1985) (The Commonwealth's appeal of a suppression order is proper as an appeal from a final order when the Commonwealth certifies in good faith that the suppression order substantially handicaps its prosecution.)).   The Commonwealth's notice of appeal contains the required certification.  Notice of Appeal, 12/14/15, at unnumbered 1.

At the suppression hearing, the Commonwealth called its lone witness, SEPTA Police Sergeant Andrew Lachowicz, to the stand. Sergeant Lachowicz testified that on February 7, 2015 at approximately 8:30 p.m., he received a radio call directing him to the platform area of 1300 Market Street, which services the subway surface/trolley and Market-Frankford lines. The call was for "male in the track area", and provided a description of a white male with blue jacket and blue knit hat. When Sergeant Lachowicz arrived at the platform, no one was in the track area. He was in "radio communication with someone in the video room", who directed him to Appellee, who was standing to his left. Sergeant Lachowicz approached Appellee and asked him if he was in the track area; Appellee responded, "Yes, I dropped my phone." Sergeant Lachowicz testified that he asked for identification to confirm Appellee's identity before "releasing him." (See N.T. 11/16/15, pp. 8-12).

Sergeant Lachowicz's examination by the Commonwealth continued as follows:

Q. So fair to say you checked him and everything checked out and he was going to be free to go?

A. That's correct.

Q. During the course of your investigation of this defendant to do those checks, ID, name, et cetera, did you ask any other questions of him?

A. I did.

Q. What were those questions?

A. I had asked him if that was his phone, and he produced the phone, he showed me the phone. I also asked him if he had identification and he began to hand me paperwork. **Then I also asked him if he had any knives, guns, needles, drugs or anything like that on his person.**

**Q. Why did you ask him that question?**

**A. That's a generalized question I like to ask people to see what their demeanor is at that point in time.**

**Q. So up to that point there was nothing specific about your interaction that caused you to ask that question?**

**A. That's correct.**

(N.T. 11/16/15, pp. 12-13) (emphasis added).

Sergeant Lachowicz testified that, at the time of the questioning, he was accompanied by Officer Matt Ryan -- and the two officers were questioning Appellee within arm's length, with Appellee's back against the wall, and with both officers draped on either side of him. It was in this context that Sergeant Lachowicz then asked Appellee about possessing contraband -- after which, he testified, Appellee started to appear nervous, and began looking to the left and right. Appellee thereafter attempted to run "between the wall and Officer Matt Ryan", but the officers "both grabbed him simultaneously" and arrested him. On his person, they recovered a folding knife and a handgun. The Commonwealth also played a video capturing most of the above events. (See N.T. 11/16/15, pp. 14-24).

On cross-examination, Sergeant Lachowicz testified, in relevant part, as follows:

Q. So you said that there were No Trespassing signs posted; is that right?

A. There were No Trespassing signs posted, yes, there were.

Q. Where are they in relation to where the defendant was?

A. I don't recall that. They're posted in the track areas at every station.

\* \* \*

Q. Where in relation to where you found the defendant was there a sign?

A. I don't recall.

Q. Was there any sign within 50 feet of him?

A. I would assume so, yes, they are posted in the tracks.

Q. I'm not asking you to assume. I'm asking you if you know.

A. At this point in time, I couldn't tell you.

Q. Was there any trespass sign where the defendant would have entered into the station and where he was found by you?

A. I don't know.

Q. You don't know?

A. I don't know that, no.

* * *

Q. So when you testified at the preliminary hearing you remember being asked this question, "So you asked him to step back against the wall, is that true?" I'm on page 16. "So you asked him to step back against the wall, is that true?"

And the answer is, "It is."

A. Yes.

Q. Do you see that?

A. Yes.

Q. So contrary to what you said a minute ago he was told to get against the wall, wasn't he?

A. Not as a pat down, no. He was asked to basically stand back against the wall, yes.

Q. So you did direct him against the wall area?

A. That's correct.

Q. And you did tell him to get against the wall; is that right?

A. That, I don't recall if I ever told him to get against the wall.

Q. Well, that's what your answer is. "You asked him to step back against the wall, is that true?"

Answer, "It is."

A. Yes.

* * *

Q. And up until then he was perfectly compliant with you and your partner; is that correct?

A. He was.

Q. No threats, no violence, no resistance in any way?

A. No, none whatsoever.

Q. You didn't observe any bulges or anything like that on his person?

A. No, I did not.

Q. So you had no suspicion of any kind of possession of weapons or any kind of criminal activity other than the going on the track and getting back up on the platform; is that right?

A. Just the behavior of him appearing nervous and looking in either directions of me and not actually answering me in the face.

Q. And when you said he was looking nervous, you said he was like looking passed you or Officer Ryan?

A. Yes.

Q. You mean he moved his eyes away from direct contact with you and the other officer; is that right?

A. Yes, it is.

Q. And was there any other indication of nervousness?

A. No.

Q. Just that he looked around?

A. Correct.

Q. And this is after you asked him about whether he had any of these illegal items on him; is that right?

A. Yes, it is.

Q. By the way, while you had him there against the wall and you were about to ask him that question about whether he had anything on him that would incriminate him in a crime and two of you were on each side of him, did you tell him he didn't have to say anything about that, that he had a right to remain silent or anything of that sort?

     MR. HAAZ: Objection.

     THE COURT: Overruled.

     THE WITNESS: No. We don't have to inform anyone of that at that point in time.

BY MR. STEIN:
Q. So your answer is you didn't inform him of that?

A. No, I did not.

Q. And on page 18 I asked you -- when I was asking you how you were positioned in regard to when the defendant was against the wall, I asked, "So he had no ability to move anywhere without passing by you or going through either of you; is that right?["]

And your answer was, "Yes," right?

A. Yes.

Q. "And still at that point you weren't planning to detain him, were you?" And your answer was, "No, he was stopped for investigation only."

Is that right?

A. Yes, it is.

Q. And the investigation included you having him with his back to the wall and blocked so that he could not move at all in any direction; is that right?

A. We were, as I stated earlier, about three feet from him, arm's length.

Q. But he couldn't get pas[t] you without running into one or the other of you; is that right?

A. No. Because he's directly next to the cashier so there's really not a whole lot of places to move at that point.

(N.T. 11/16/15, pp. 31-38).

Upon taking the matter under advisement and carefully considering the foregoing evidence, this Court granted Appellee's Motion to Suppress. The Commonwealth thereafter filed the instant appeal.

Suppression Court Opinion, 5/20/16, at 2-7.

The suppression court granted Appellee's motion on November 23, 2015. The Commonwealth filed a motion for reconsideration that was denied on November 30, 2015. On December 14, 2015, the Commonwealth filed a timely notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). The suppression court filed its opinion on May 20, 2016.

On appeal, the Commonwealth presents the following issue for this Court's consideration:

> Did the lower court erroneously suppress [Appellee's] loaded handgun, where officers had probable cause to arrest him based on his admission that he had jumped onto the subway track and, alternatively, reasonable suspicion to stop and investigate [Appellee], which ripened into probable cause when he fled?

The Commonwealth's Brief at 2.

Our standard of review of a trial court's order granting a criminal defendant's motion to suppress evidence is well established:

> When the Commonwealth appeals from a suppression order, we follow a clearly defined standard of review and consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of fact bind an appellate court if the record supports those findings. The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty is to determine if the suppression court properly applied the law to the facts. **Commonwealth v. Miller**, 56 A.3d 1276, 1278–1279 (Pa. Super. 2012) (citations omitted). "Our standard of review is restricted to establishing whether the record supports the suppression court's factual findings; however, we maintain *de novo* review over the suppression court's legal conclusions." **Commonwealth v. Brown**, 606 Pa. 198, 996 A.2d 473, 476 (2010) (citation omitted).

*Commonwealth v. Korn*, 139 A.3d 249, 252-253 (Pa. Super. 2016).

Here, Appellee presented no witnesses, and the Commonwealth presented one. Therefore, the Commonwealth's evidence is uncontradicted. *See Commonwealth v. Smith*, 979 A.2d 913, 917-918 (Pa. Super. 2009) (The "Commonwealth's evidence is essentially uncontradicted" because the defense did not present any witnesses at the suppression hearing). However, "[i]t is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony." *Commonwealth v. Gallagher*, 896 A.2d 583, 585 (Pa. Super. 2006). Our scope of review from a suppression ruling is limited to the evidentiary record that was created at the suppression hearing. *In re L.J.*, 79 A.3d 1073, 1087 (Pa. 2013).

As described above, the instant case involves a police detention. This Court has explained:

> "'Interaction' between citizens and police officers, under search and seizure law, is varied and requires different levels of justification depending upon the nature of the interaction and whether or not the citizen is detained." *Commonwealth v. DeHart*, 745 A.2d 633, 636 (Pa. Super. 2000). The three levels of interaction are: mere encounter, investigative detention, and custodial detention. *Id.*
>
> > A mere encounter can be any formal or informal interaction between an officer and a citizen, but will normally be an inquiry by the officer of a citizen. The hallmark of this interaction is that it carries no official compulsion to stop or respond.

> In contrast, an investigative detention, by implication, carries an official compulsion to stop and respond, but the detention is temporary, unless it results in the formation of probable cause for arrest, and does not possess the coercive conditions consistent with a formal arrest. Since this interaction has elements of official compulsion it requires reasonable suspicion of unlawful activity. In further contrast, a custodial detention occurs when the nature, duration and conditions of an investigative detention become so coercive as to be, practically speaking, the functional equivalent of an arrest.

*Id*. (internal citations and quotation marks omitted).

*Commonwealth v. Tam Thanh Nguyen*, 116 A.3d 657, 664 (Pa. Super. 2015).

This Court has stated the following regarding reasonable suspicion:

> [T]o establish grounds for reasonable suspicion, the officer must articulate specific observations which, in conjunction with reasonable inferences derived from those observations, led him reasonably to conclude, in light of his experience, that criminal activity was afoot and that the person he stopped was involved in that activity. The question of whether reasonable suspicion existed at the time [the officer conducted the stop] must be answered by examining the totality of the circumstances to determine whether the officer who initiated the stop had a particularized and objective basis for suspecting the individual stopped. Therefore, the fundamental inquiry of a reviewing court must be an objective one, namely, whether the facts available to the officer at the moment of the stop warrant a man of reasonable caution in the belief that the action taken was appropriate.

*Commonwealth v. Basinger*, 982 A.2d 121, 125 (Pa. Super. 2009) (internal citations and quotation marks omitted; alterations in original).

- 10 -

Furthermore, we note that "[p]robable cause for a warrantless arrest exists if the totality of the circumstances known to the officer is sufficient to justify a person of reasonable caution in believing the suspect has committed a crime." *Commonwealth v. Pitner*, 928 A.2d 1104, 1110 (Pa. Super. 2007). Finally:

> [t]he exclusionary rule provides that evidence obtained due to an unconstitutional search or seizure cannot be used against a defendant. The exclusionary rule also applies to any evidence discovered as a result of the original illegal police conduct; such evidence is termed "fruit of the poisonous tree."

*Commonwealth v. Williams*, 2 A.3d 611, 619 (Pa. Super. 2010).

Here, the suppression court concluded that the Commonwealth's claim that Appellee admitted trespass was specious. Suppression Court Opinion, 5/20/16, at 12. The suppression court stated that Sergeant Lachowicz testified that he did not observe any criminal or suspicious activity but was informed by a radio call to investigate a white male with a blue jacket and blue knit cap in the track area. Sergeant Lachowicz and another officer questioned Appellee near the wall on the train platform, and the suppression court found that "there *quite literally* was nowhere for [Appellee] to go." *Id*. at 14 (emphasis original). The suppression court noted: "Indeed, Sergeant Lachowicz *explicitly testified that Appellee was being detained* -- which alone completely debunks the Commonwealth's claim that the police activity was a 'mere encounter.'" *Id*. at 14 n.1 (emphasis original).

The suppression court opined:

- 11 -

A person is seized if, in view of all of the circumstances surrounding the incident, **a reasonable person would have believed that he was not free to leave**.[] Michigan v. Chesternut, 486 U.S. 567, 108 S. Ct. 1975, 1979 (1988) (emphasis added) (quoting United States v. Mendenhall, 110 S. Ct. at 1877).

The totality of the circumstances in this case plainly establishes that **a reasonable person would have believed that he was not free to leave**. The arresting officer, Sergeant Lachowicz, testified that he did not observe any criminal or suspicious activity, but was directed via radio call to investigate a white male with a blue jacket and blue knit cap in the track area. Sergeant Lachowicz did not observe Defendant in the track area but saw him on the platform. He could not recall whether any "no trespassing" signs were posted anywhere near where Appellee retrieved his cell phone. He and his brother officer, Officer Ryan, directed Appellee to go with them to the wall of the platform for questioning. The two officers, in full uniform with handguns exposed, stood within "arm's length" of Appellee, whose back was against the wall; the officers were draped "on either side of him." Thus, there quite literally was nowhere for him to go

It was in this context that the two officers began questioning Appellee, who was fully compliant. Sergeant Lachowicz testified that there was not enough criminal activity to even merit a citation in this case, let alone an arrest. He also testified that it was his intention to "release" Appellee upon ascertaining his identity. Appellee provided the officers with his identification when asked for same. At this point, the questioning should have ceased and Sergeant Lachowicz should have verified his identification. Instead, Sergeant Lachowicz asked an incriminating question -- whether he had any knives, guns, needles, drugs, et cetera -- wholly unrelated to his "investigation", and further, in circumstances where he intended to "release" Appellee, as opposed to pat him down or search him incident to arrest. In that regard, Sergeant Lachowicz also testified that he did not discern any "bulges" or any other indication to justify such a sweeping interrogation. Nonetheless, he asked the incriminating question, and in response, Appellee started to act nervous. The resultant struggle, and evidence seized, was the fruit of an unconstitutional seizure, pure and simple.

- 12 -

> Credibility is another significant factor in this case. Sergeant Lachowicz repeatedly testified on both direct and cross-examination that Appellee showed signs of nervousness only after he asked the incriminating question. Sergeant Lachowicz then changed his story much later at the hearing and claimed that Appellee was nervous the whole time. As a result, this Court found his testimony lacking credibility. For this reason alone, and with no other testimony, the motion was properly granted.
>
> The Commonwealth's second and final claim is equally spurious and unavailing. Specifically, it claims, "Irrespective of any prior alleged illegality, was there probable cause for arrest where, having admitted committing trespass, defendant violently resisted the officers' attempt to prevent him from running away?" Here, again, the Commonwealth premises its claim on the misplaced notion that Appellee admitted to committing trespass. More disconcertingly, the Commonwealth expressly discounts any prior illegality, en route to positing that Appellee should have been arrested for running away. This of course not only ignores the totality of the circumstances which justifies the granting of the motion as discussed above -- but completely eviscerates the exclusionary rule and fruit of the poisonous tree doctrine. The suppression motion was properly granted based on the evidence in this case.

Suppression Court Opinion, 5/20/16, at 14-15 (emphasis original) (footnote omitted).

As we stated above, the determination as to the credibility of a witness is left to the discretion of the suppression court. *Gallagher*, 896 A.2d at 585. Here, credibility was a determinative factor, and the suppression court did not find Sergeant Lachowicz credible. Suppression Court Opinion, 5/20/16, at 15.

Based on the totality of the circumstances as testified to by the Commonwealth's only witness, whom the suppression court did not find

- 13 -

credible, we discern no abuse of discretion in the suppression court's order. Appellee complied with the sergeant's commands and was backed up against a wall in connection with the radio call regarding a person in the track area. After Appellee produced his identification, and at a point when Sergeant Lachowicz testified that he was going to release Appellee, the sergeant then engaged in a secondary line of questioning concerning weapons and needles, despite having stated that he had no reason to believe that Appellee possessed those items. N.T., 11/16/15, at 35. This secondary line of interrogation regarding contraband was conducted without reasonable suspicion or probable cause; thus, Appellee should have been free to refuse to answer and depart. *Tam Thanh Nguyen*, 116 A.3d at 664. Instead, the officers seized Appellee and searched his person unlawfully. Accordingly, we are constrained to affirm the order of the suppression court.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/24/2017