J-A17039-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ISIAH GIBBONS | : | No. 1940 EDA 2023 |

Appeal from the Order Entered June 27, 2023
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0007571-2022

BEFORE: BOWES, J., NICHOLS, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.: **FILED NOVEMBER 17, 2025**

The Commonwealth appeals the order granting suppression to Isiah Gibbons ("Gibbons"), arising from an encounter that began when officers saw him standing on the street with a concealed weapon in his pants. We affirm.[1]

The facts relevant to this appeal established at the suppression hearing are as follows:

On September 29, 2022, at approximately 4:55 p.m., Philadelphia Police Officer Marc Kusowski ("Officer Kusowksi") and his partner, Officer Christopher Rycek ("Officer Rycek") (collectively, "the officers"), were on patrol and wearing body cameras ("BWC") in the area of 1000 East Ontario Street in Philadelphia. **See** N.T., 3/24/23, at 6, 13-14; Exhibit C-6.[2] As the

---

[1] The Commonwealth has filed an application for relief requesting an update on the status of the Court's decision that we deny as moot given our decision on this appeal.

[2] Exhibit C-6 is Officer Kusowski's BWC video.

officer drove, they encountered Gibbons where he stood on the sidewalk with the outline of a firearm in his waistband at his hip. *See id*. at 9; Exhibit C-6. The uniformed officers pulled their patrol car sideways to the curb and walked toward Gibbons, who was holding a black bag in his right hand and had a bag slung over his left shoulder. *See* N.T., 3/24/23, at 9-10, Exhibit C-6 at 1:00.

Officer Kusowski realized Gibbons might have a permit to carry a weapon. *See* N.T., 3/24/24, at 10. Officer Kusowski asked, "You got a permit to carry, big guy?" Gibbons responded, "Yeah, it's in the house," gestured to his right, and began walking toward the officers. *See id*. at 1:02. Officer Rycek pointed and said, "We could see the gun on your hip." *See* Exhibit C-7[3] at 1:07.

Officer Kusowski stated, "Alright. Let me just get your ID from you." Gibbons approached the officer and reached his hand into a bag he wore over his left shoulder, as the officer continued, "Is that alright? I appreciate that. Is that okay?" Gibbons replied, "Yeah, but my permit [is] in the house," as he put the bag from his right hand on the hood of a nearby car and took out his wallet. *See* Exhibit C-6 at 1:08; Exhibit C-7 at 1:08. As Gibbons reached into his wallet, Officer Kusowski remained arms-length away and said, "That's cool. If you let me see your ID, if that's okay with you? There's nothing wrong with you having a gun, man." *See* Exhibit C-6 at 1:08-1:13. Gibbons handed his ID to Officer Kusowski. *See* Exhibit C-6 at 1:14.

_____

[3] Exhibit C-7 is Officer Rycek's BWC video.

- 2 -

Officer Rycek, who stood to Officer Kusowski's left, more than arms-length from Gibbons, said, "You look like you were going to duck behind the car and try and run," and laughed. **Exhibit** C-6 at 1:14-1:15; Exhibit C-7 at 1:14-1:17. Gibbons handed his license to Officer Kusowski. **See id**. at 1:15. Gibbons gestured upward and to his left and said, "I [live] all the way up here." **See id**. at 1:15-:1:17. Officer Kusowski held up the ID and said, "Can I, can I check this, is that okay?" **See id**. at 1:17-1:19. Gibbons said, "Yeah, but my jawn [is] in the house." **See** Exhibit C-7 at 1:20-1:22. Officer Kusowski said, "I appreciate it," and walked toward the passenger door of the open patrol car. **See** Exhibit C-6 at 1:19-1:20. The officer then immediately turned back and said, "No, no, no. This is all that I need," and gestured to the ID. **See id**. at 1:20-1:22. Officer Kusowski carried the ID to the passenger seat and sat down. **See id**. at 1:22-1:29. Gibbons said, "If it don't come up, my brother got his around the corner," and gestured to his right. **See** Exhibit C-7 at 1:22-1:26. Officer Rycek, said, "Okay, sounds good," then as Gibbons reached toward the area where he had the gun, Officer Rycek lifted Gibbons hands and said, "Hey, don't touch it, don't touch it, don't touch it." **See** id. at 1:27-1:29. Gibbons said, "It's clean." **See id**. at 1:30. Officer Rycek said, "All good. I'm going to hold the gun for you, all right," and then asked, "So your brother has the permit, not you?" **See id**. at 1:30-1:34.[4]

_____

[4] As this exchange occurred, Officer Kusowski typed a few keys on his computer with his left hand, but he almost immediately got out of the
*(Footnote Continued Next Page)*

Gibbons said, "Yeah. My brother, my brother." *See id*. at 1:34-1:36. Officer Rycek said, "Okay." *See id*. at 1:37. Officer Kusowski returned as Officer Rycek began to handcuff Gibbons. Officer Rycek told him, "His brother has the permit, not him. He said his brother can come with the permit." *See id*. at 1:38-1:42. The officers then placed Gibbons in the patrol car. *See id*. at 1:42-1:51.

After oral argument at the suppression hearing, the trial court granted Gibbons's motion to suppress. The Commonwealth timely appealed the suppression ruling. Both the Commonwealth and the trial court complied with Pa. R.A.P. 1925.

The Commonwealth presents the following issue for review:

> Did the lower court err by granting the motion to suppress where police saw defendant on the street with a gun, approached and spoke with him, and confirmed he did not have a license for the weapon?

Commonwealth's Pa.R.A.P. 1925(b) Statement, at 1.

The Commonwealth's issue implicates the nature of the officers' interaction with Gibbons.

When a defendant litigates a motion to suppress, the Commonwealth bears the burden to prove, by the preponderance of the evidence, that the

---

passenger seat and started walking back to Gibbons and Officer Rycek. *See* Exhibit C-6 at 1:29-1:34.

- 4 -

challenged evidence was not obtained in violation of the defendant's rights. *See Commonwealth v. Wallace*, 42 A.3d 1040, 1047-48 (Pa. 2012). When the Commonwealth appeals against an unfavorable suppression order, the Court considers only the evidence from the defense witnesses, together with the evidence of the prosecution that when read in the context of the entire record remains uncontradicted.[5] The suppression court's findings of fact bind an appellate court if the record supports those findings. *See Commonwealth v. Korn*, 139 A.3d 249, 252 (Pa. Super. 2016). However, this Court is not bound by the suppression court's conclusions of law, which it reviews *de novo*. *Id*. at 252-53.

The Fourth Amendment of the U.S. Constitution and Article I, Section 8 of Pennsylvania's Constitution protect citizens from unreasonable searches and seizures. *See Commonwealth v. McAdoo*, 46 A.3d 781, 784 (Pa. Super. 2012). To protect this right, courts have interpreted the law to require police to articulate the basis for their interaction with citizens in "intrusive" situations. *See Id*.

The law recognizes three distinct levels of interaction between police officers and citizens: (1) a mere encounter; (2) an investigative detention, often described as a *Terry* stop, and (3) an arrest. *See Commonwealth v. Jefferson*, 256 A.3d 1242, 1247 (Pa. Super. 2021).

---

[5] Gibbons presented no evidence in this case.

"A mere encounter can be any formal or informal interaction between an officer and a citizen[] but will normally be an inquiry by the officer of a citizen. The hallmark of this interaction is that it carries no official compulsion to stop or to respond.*" **See Jefferson** at 1248 (**quoting Commonwealth v. DeHart**, 745 A.2d 633, 636 (Pa. Super. 2000). No form of suspicion is required for a "mere encounter." **See Jefferson, id**. In contrast, an investigative detention carries an official compulsion to stop and respond, and therefore, requires reasonable suspicion of unlawful activity.[6] **Id**.

Not all interactions between policemen and citizens involve "seizures." **See Terry**, 392 U.S. at 19, n.16. A seizure may occur only when an officer by means of physical force or show of authority restrains the liberty of a citizen. **See id**. In determining which level of interaction occurred, courts conduct an objective examination of the totality of the surrounding circumstances. **See Commonwealth v. Lyles**, 97 A.3d 298, 302 (Pa. 2014). The focus of the totality of circumstances test centers on whether a citizen's movement has in some manner been restrained by physical force or show of coercive activity. **See Commonwealth v. Parker**, 161 A.3d 357, 363 (Pa. Super. 2017).

---

[6] Neither party argues that the third type of an interaction, an arrest, is implicated here.

A person has been "seized" within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would believe they are not free to leave the interaction. *See United States v. Mendenhall*, 446 U.S. 544, 553 (1980). However, the Pennsylvania Supreme Court has recognized that few people will actually be free to walk away or refuse to answer:

> if the ultimate issue is perceived as being whether the suspect 'would feel free to walk away,' then virtually all police-citizen encounters must in fact be deemed to involve a Fourth Amendment seizure. The *Mendenhall*-[*Roye*r][7] standard should not be given such a literal reading as to produce such a result. ... Rather, the confrontation is a seizure only if the officer adds to those inherent pressures by engaging in conduct significantly beyond that accepted in social intercourse.

*Commonwealth v. Mathis*, 173 A.3d 699, 713 (Pa. 2017) (citations omitted).

In considering whether a seizure occurred or whether a reasonable person would feel free to leave, courts examine, *inter alia*: the number of officers present during the interaction; whether the officer informed the citizen that they were suspected of criminal activity; the location and timing of the interaction; the display of a weapon by the officer; some physical touching of the citizen, the questions asked by officers; and the use of language or tone of voice indicating compliance with the officer's request might be compelled. *See Commonwealth v. Livingstone*, 174 A.3d 609, 621 (Pa. 2017);

---

[7] *See Florida v. Royer*, 460 U.S. 491 (1983).

*Commonwealth v. Jones*, 266 A.3d 1090, 1095 (Pa. Super. 2021). Retention of an identification card by police to conduct a warrant check will generally be a material and substantial escalating factor within the totality assessment. *See Commonwealth v. Cost*, 224 A.3d 641, 652 (Pa. 2020). Under the totality of the circumstances test, no single factor controls the ultimate conclusion as to whether a seizure occurred. *See Commonwealth v. Anderson*, 276 A.3d 282, 295 (Pa. Super. 2022). Finally, and significantly, the police may not infer criminal activity merely from an individual's possession of a concealed firearm in public. *See Commonwealth v Hicks*, 208 A.3d 916, 936-37 (Pa. 2019).

Here, the suppression court found the encounter between Gibbons and the officers constituted an investigative detention lacking reasonable suspicion. *See* Suppression Court Opinion, 9/26/23, at 7-8. The court found based on the totality of the circumstances, a reasonable person would not have felt free to leave, citing the officers' swift exiting from their vehicles together with the act of stopping Gibbons to ask if he had a permit to carry the concealed firearm. *See id*. at 12. Additionally, the court stated, the officers' dissatisfaction with Gibbons's answer, combined with the officers' request for proof of a firearm license and their taking of Gibbons's I.D. to run a computer search, showed this interaction went beyond a mere encounter. *See id*. at 12-13. Finally, Gibbons's possession of a concealed

firearm in public did not permit the inference of criminal activity. *See id*. at 11.

Although we find this to be an extremely close case in which the police behaved in an exemplary manner, we affirm the grant of suppression. Our decision is compelled by the conclusion that a reasonable person would not have felt free to leave when two uniformed officers in a marked patrol car pulled diagonally to the curb directly before him, requested and took his identification, and questioned him about whether he possessed a permit for the gun, particularly where the mere fact of a concealed weapon does not in itself establish reasonable suspicion. *See Hicks*, 208 A.3d at 936-37; *Cost*, 224 A.3d at 652.

We recognize the officers did not inform Gibbons he was suspected of criminal activity, did not display a weapon, did not touch him, spoke with him in a polite, conversational manner, explicitly stated there was nothing wrong with Gibbons having a gun, and retained his ID for no longer than ten seconds. However, at that time of the officers' interaction with Gibbons, the only information they had was that he possessed a concealed weapon, which is not in itself a basis for reasonable suspicion; their taking of Gibbons's ID, even for a brief period, was a material and substantial escalating factor in assessing a reasonable person's feeling of freedom to leave. Further, the Commonwealth can point to no other factor that gave police a basis to suspect Gibbons was engaging in criminal activity other than his possession of what appeared to be

the outline of a firearm. The suppression court found that under the totality of the circumstances, a reasonable person would not have felt free to walk away from the officers. On this record, we are unable to reverse as an abuse of discretion the suppression court's conclusion that the encounter was an investigative detention for which no reasonable suspicion existed. Accordingly, the court did not abuse its discretion by granting suppression.

Order affirmed. Application for relief denied as moot.

Judge Nichols joins this decision.

Judge Bowes files a dissenting memorandum.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 11/17/2025