J-S26008-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN THE INTEREST OF: D.X.P., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: D.X.P. | |
| | No. 1256 MDA 2014 |

Appeal from the Dispositional Order June 2, 2014
In the Court of Common Pleas of York County
Juvenile Division at No(s): CP-67-JV-0000222-2014

BEFORE:  OTT, J., WECHT, J., and JENKINS, J.

MEMORANDUM BY OTT, J.:                    **FILED JULY 10, 2015**

D.X.P. appeals from the dispositional order entered following an adjudication of delinquency for the offenses of possession of a firearm prohibited, carrying a firearm without a license, and possession of a firearm by a minor, flight to avoid apprehension, and disorderly conduct.[1]  The sole issue raised on appeal is a challenge to the court's suppression ruling. Based upon the following, we affirm, albeit on other grounds.

The facts adduced at the suppression hearing and accepted by the court are set out on the record, as follows:

> The Court has heard testimony and has accepted into evidence a number of items. In addition there was a stipulation that was

---

[1] 18 Pa.C.S. §§ 6105(a)(1), 6106(a)(1), and 6110.1(a), 5126(a), and 5503(a)(4), respectively.

made between the parties. That stipulation involves the minor's age, the ballistics report, which indicates that the gun in question was functional, and a report from the State Police indicating that [D.X.P.] did not have a license to carry a firearm.

The Commonwealth's first witness was Officer [Daniel] Kling with York City Police Department. He has been with York City Police Department three and a half years. He stated that on May 1, 2014, he was on duty with two other officers. All three were on bikes and in uniform. It was approximately 5:50 p.m. when he received the report from County Control that there were multiple calls for an active fight at 26 West South Street. No descriptions were given of the individuals involved. At the time of the call they were approximately a block away. They could actually see the vicinity of the area, and it did not appear that there was a fight going on, although there was a large group of people.

He stated they got to the area within 30 seconds. He testified that the area in question is a high crime area, that fights occur every day in the park which is adjacent to this area. There are a number of drug and firearm arrests as well. He stated that when he came upon the scene there were a group of people yelling around the corner that the police were coming.

As they came around the corner there were a group of three young males, one of which was [D.X.P.]. The officer stated that the individuals were tracking the police, looking at them, turning around and walking faster and then constantly looking back at them.

The officer stated as he got behind them he asked them to stop. [D.X.P.], who was in the middle of the group, then started to flee. He stated that as he was running he was grabbing his pants with his left hand. They pursued on bike. The pursuit lasted approximately 30 seconds to a minute. They went through traffic, almost getting hit by a van.

During the course of the pursuit one of the officers had come around and approached the Juvenile from a different direction. The Juvenile was coming down an alleyway and was confronted by this officer who attempted to tase him. As the Juvenile was coming at her she yelled that he had a gun. At that time it became evident to Officer Kling that [D.X.P.] had a firearm in his right hand. He was again told to stop. He observed [D.X.P.]

switch the gun into his other hand. He ran into a group of 30 people and went through the middle of the group.

[D.X.P.] then came up to a trash can, put his hand out, and dropped the gun into the trash can. [D.X.P.] went an additional 15 feet, stopped, and put his hands in the air where he was apprehended.

The firearm was retrieved by the other officer. It had six live rounds in it. … Officer Glatfelter testified, in essence, to the same information as Officer Kling.

Admitted into evidence were four exhibits. Exhibit 1 is the firearm in question; Exhibit 2 is the six rounds; Exhibit 3 is the Pennsylvania State Police report; and Exhibit 4 is the report indicating that [D.X.P.] does not have a license to carry a firearm.

Order, dated 6/2/2014, filed 6/6/2014, at 2–5. **See also** N.T., 6/2/2014, at 38–40. The juvenile court determined that the officers had reasonable suspicion to pursue D.X.P., and denied the suppression motion. Thereafter, the court adjudicated D.X.P. delinquent, and entered a dispositional order placing him on formal probation and into the Juvenile Drug Court Program, if accepted, and if not, he was to be placed at the Forestry Camp #3 First Step Program. This appeal followed.[2]

D.X.P. challenges the order denying his motion to suppress physical evidence. In reviewing such claims, we apply a well-established standard of review:

Our standard of review in addressing a challenge to the denial of a suppression motion is

_____

[2] D.X.P. timely complied with the order of the juvenile court to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal.

limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. The suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.

*Commonwealth v. Ranson*, 103 A.3d 73, 76 (Pa. Super. 2014) (citation omitted), *appeal denied*, ___ A.3d ___ (Pa. May 13, 2015).

D.X.P. contends "the officers did not have reasonable suspicion of D.X.P. being involved in criminal activity when they ordered D.X.P. to stop" and, therefore "the gun should have been suppressed as fruit of the poisonous tree as the officers did not have reasonable suspicion to order D.X.P. to stop and the gun was abandoned by coercion." D.X.P.'s Brief at 10. D.X.P. argues further: "If this Honorable Court finds that the initial order for D.X.P. to stop created a mere encounter as opposed to an investigative detention, D.X.P. asserts that the officers did not have the reasonable suspicion to seize D.X.P. by pursuing him and the abandoned gun should have been suppressed as fruit of the poisonous tree." *Id.* at 16.

The principles that guide our review are as follows:

"'Interaction' between citizens and police officers, under search and seizure law, is varied and requires different levels of justification depending upon the nature of the interaction and whether or not the citizen is detained." **Commonwealth v. DeHart**, 745 A.2d 633, 636 (Pa. Super. 2000). The three levels of interaction are: mere encounter, investigative detention, and custodial detention. **Id.**

A mere encounter can be any formal or informal interaction between an officer and a citizen, but will normally be an inquiry by the officer of a citizen. The hallmark of this interaction is that it carries no official compulsion to stop or respond.

In contrast, an investigative detention, by implication, carries an official compulsion to stop and respond, but the detention is temporary, unless it results in the formation of probable cause for arrest, and does not possess the coercive conditions consistent with a formal arrest. Since this interaction has elements of official compulsion it requires reasonable suspicion of unlawful activity. In further contrast, a custodial detention occurs when the nature, duration and conditions of an investigative detention become so coercive as to be, practically speaking, the functional equivalent of an arrest.

**Id.** (internal citations and quotation marks omitted).

Reasonable suspicion exists only where the officer is able to articulate specific observations which, in conjunction with reasonable inferences derived from those observations, led him reasonably to conclude, in light of his experience, that criminal activity was afoot and that the person he stopped was involved in that activity. Therefore, this Court must make an objective inquiry, namely, whether the facts available to the officer at the moment of the [intrusion] warrant a man of reasonable caution in the belief that the action taken was appropriate.

**Commonwealth v. Plante**, 2006 PA Super 376, 914 A.2d 916, 922 (Pa. Super. 2006) (internal citations and quotations omitted).

"To determine whether a mere encounter rises to the level of an investigatory detention, we must discern whether, as a matter of law, the police conducted a seizure of the person involved." ***Commonwealth v. Reppert***, 814 A.2d 1196, 1201 (Pa. Super. 2002).

> To decide whether a seizure has occurred, a court must consider all the circumstances surrounding the encounter to determine whether the demeanor and conduct of the police would have communicated to a reasonable person that he or she was not free to decline the officer's request or otherwise terminate the encounter. Thus, the focal point of our inquiry must be whether, considering the circumstances surrounding the incident, a reasonable [person] innocent of any crime, would have thought he was being restrained had he been in the defendant's shoes.

*Id*. at 1201-1202 (internal citations and quotations omitted).

***Commonwealth v. Ngyuen***, ___ A.3d ___, ___ [2015 PA Super 98] (Pa.

Super. April 27, 2015) (quotations and citations omitted).

At the hearing, Officer Kling testified regarding his interaction with

D.X.P. as follows:

At approximately 5:50 p.m. on May 1st [2014] myself, Officer Glatfelter, and Officer Vogel were working in the South End Neighborhood Enforcement Unit. We were in full bike uniform and riding bikes that day.

At that time we were dispatched to a fight in the first block of West South Street, specific address was 26 West South Street, and at that time we were in the first block of East South Street, so we were only about a block away.

From our location we could see a small group of people in front of that residence, but I did not see anybody actively fighting at that time. As we came into the area we approached a small group of people standing on the corner. At that time I could see

them telling everybody else around the corner that the police were coming.

As I rounded the corner, I [saw] a group of people, I can't tell you how many, but there was a group of people there, and they were all walking away from me. They were walking southbound on Lindberg Avenue, and **at the front of this group I saw a group of three young male juveniles that were walking at a faster gait than everybody else. They were turning their heads to look at us. They would turn their heads back and look forward and increase their pace and then they would look back at us and watch where myself and Officer Glatfelter were.**

**At that time I observed that they were the only ones that were looking at us and watching every move that we made. So I got behind them, the group of three. They were on the sidewalk on the east side of Lindberg Avenue. I got behind this group. Officer Glatfelter went out around. He was on Lindberg Avenue and attempted to get in front of the group of three as he knew I was going to attempt to stop them.**

**As I got behind them I told all three individuals to stop, police. I told them that I wanted to talk to them, to stop. One juvenile in particular, [D.X.P.], wh[o] is seated at the defense table wearing all black, he was standing in the middle of the group of three. He weaved in between the two and began to run south on Lindberg Avenue. The other two males stayed there, but [D.X.P.] began to run. I saw him grab ahold of his pants with his left hand, and he took off running.**

He ran south on Lindberg Avenue until he got to Charles Street. At that time he ran east on Charles Street to George Street, and at that time myself and Officer Glatfelter pursued him on bikes. Officer Vogel, she also pursued on bike, but she took a different route. I was calling the pursuit out on the radio as we were chasing him.

\*\*\*\*

When [D.X.P.] turned left onto Snyder Place he met with Officer Vogel. She was coming the opposite direction in an attempt to

meet with him. When [D.X.P.] turned the corner, Officer Vogel did dismount her bike, she drew her Taser, and she attempted to Tase him. She missed with the Taser.

At this point myself and Officer Gla[t]felter were only 20 feet behind [D.X.P.], I would say just an estimate. We were in close proximity. When she Tased him she yelled out, Gun, and at that point I noticed that [D.X.P.] was holding a firearm with his right hand by the barrel. With his left hand he was holding up his pants and with the right hand he was holding the barrel of this revolver, it was a long barrel revolver, and he was still running.

****

At that point myself and Officer Gla[t]felter both dr[e]w our firearms on him, and we continued to pursue him on bikes. … [D.X.P.] switched hands or switched the gun in his hands to his left hand, and at that time he grabbed the gun by the grip and he turned towards me. When he turned towards me I could see his face. I was telling him, Put it down, put it down, put it down, drop the gun. And at that point he turned back around, turned the bend onto Lindberg Avenue to the exact location where he began to run in the first place.

****

When he goes through this crowd of people … it was probably 20 feet I'm behind him. I see his, with his left hand he holds it out, and in front of this residence, right past this group of people there's like a big trash can, like a 55-gallon trash can. He holds the gun out and drops it in the trash can, goes about 15 more feet, throws his hands up in the air and slows his gait, he slows down to a slow walk. He turns to me. I yell at Officer Glatfelter that there's a gun in the trash can, and I point at the trash can, and I go directly towards [D.X.P.] I dismount my bike, … and I took [D.X.P.] into custody.

N.T., 6/2/2014, at 4–10 (emphasis supplied). Officer Kling further testified

that the area was a high crime area where "[t]here are multiple drug deals

that occur" and "fights that occur in the park." *Id.* at 11–12. He stated,

"We make multiple arrests in the park with firearms, with drugs, [and] with disorderly people." *Id.* at 12.

Here, the court reasoned:

The first issue the Court needs to address is whether the request to stop and subsequent pursuit by the police officers constitutes a seizure. If it was not a seizure then the weapon would be properly lawfully seized by the police officer. If it does constitute a seizure, then the seizure is considered to be coerced and the officer must demonstrate either probable cause to make the seizure or have reasonable suspicion to stop and frisk.

\*\*\*\*

… Our Supreme Court has determined that due to heightened privacy considerations in Pennsylvania, a police officer's pursuit of a person fleeing is a seizure for purposes of Article 1, Section 8 of the Pennsylvania Constitution. [*Commonwealth v. Matos*, 672 A.2d 769 (Pa. 1996)].

Thus, pursuant to *Matos*, any contraband discarded during a pursuit is abandoned by coercion and the officer must demonstrate either probable cause to make the seizure or reasonable suspicion to stop and frisk. Therefore, based upon *Matos* the inquiry in this case becomes whether the police officers demonstrated reasonable suspicion at the time they began pursuit of [D.X.P.].

In order to demonstrate reasonable suspicion, the police officer must be able to point to specific and articulable facts and reasonable inferences drawn from those facts in light of the officer's experience. Caselaw has also established that certain facts taken alone do not establish reasonable suspicion. For instance, in *Matos*, it was determined that flight alone does not constitute reasonable suspicion; in *Commonwealth [v.] Kearney*[, 601 A.2d 346 (Pa. Super. 1992),] mere presence in a high crime area did not constitute reasonable suspicion; and under *Commonwealth [v.] Hawkins*[, 692 A.2d 1068 (Pa. 1997),] an anonymous tip alone did not constitute reasonable suspicion.

[That] being stated, the determination of reasonable suspicion requires an evaluation of the totality of the circumstances, with a lesser showing needed to demonstrate reasonable suspicion in both terms of quality and content and reliability than probable cause.

In the instant matter there is a combination of factors present which would warrant reasonable suspicion by the officer. As stated, there was an anonymous tip, in fact several anonymous tips made to police regarding a fight in the area; the fact that this was a high crime area; the actions taken by the juveniles in tracking the police officers; and then finally the flight by the Juvenile. All of these factors taken collectively constitute reasonable suspicion for the officer to pursue the Juvenile.

Order, dated 6/2/2014, filed 6/6/2014, at 5–8. **See also** N.T., 6/2/2014, at 40–43. Contrary to the juvenile court, we conclude police lacked reasonable suspicion to stop and pursue D.X.P.

In this case, the facts show that D.X.P.'s detention commenced when Officer Kling issued the command to stop. That is, when Officer Kling approached the three males from behind on bike, and told them "to stop, police … I want[] to talk …, to stop,"[3] a reasonable person in D.X.P.'s position would not have felt free to depart. **Commonwealth v. Ranson**, 103 A.3d 73, 77 (Pa. Super. 2014) (appellant subjected to investigative detention when uniformed officers commanded appellant to stop); **Commonwealth v. Key**, 789 A.2d 282, 288 (Pa. Super. 2001) ("When an officer, by means of physical force or show of authority, has restrained the liberty of an individual, a 'seizure' has occurred."). In fact, the other two

---

[3] N.T., 6/2/2014, at 6.

individuals with D.X.P. did stop. Therefore, we conclude an investigative detention occurred at that moment.

The next part of the inquiry is whether police had reasonable suspicion to support the detention. Here, the officers were on bike patrol when they received a county control report that there were multiple calls regarding a fight at 26 West South Street. At that time, police were a block away and they could see people outside the residence, but did not see a fight. When they arrived at the scene 30 seconds later, people at the corner were yelling to others around the corner that police were coming. The officers rounded the corner and saw a group of people walking away. Officer Kling spotted three young males, including D.X.P., at the front of the group, watching police over their shoulders and walking at a faster gait. We conclude these facts do not establish reasonable suspicion to justify the stop of D.X.P.

Although police received the report of the fight from county control, no descriptions of individuals were provided, and police saw no evidence of a fight. The only pertinent factors in this case were the high crime area, the three males' actions in looking back at police, and their fast paced gait as they walked away from police and the reported scene of a fight. However, walking away from police officers in a high crime area is not sufficient to justify an investigative detention of that individual. ***See In the Interest of J.G.***, 860 A.2d 185, 187 (Pa. Super. 2004) ("[P]olice did not establish a reasonable suspicion of criminal activity to justify an investigatory stop and

search of Appellant, where the only evidence of criminal wrongdoing was Appellant's presence in a high crime area combined with his decision to 'walk away' from the police officers upon seeing their approach"). Further, while Officer Kling testified the three males were turning their heads to watch police, we cannot conclude that this conduct, along with walking away quickly from police in a high crime area, were sufficient to provide Officer Kling with a reasonable belief that D.X.P. was engaged in illegal behavior.[4] Therefore, we conclude that the officers lacked reasonable suspicion to justify the stop and pursuit of D.X.P.

Our inquiry, however, does not end here. The Commonwealth argues that "even if the police had no cause to chase [D.X.P.], [D.X.P.'s] actions of running through heavy traffic causing vehicles to swerve, and the juvenile possessing a handgun constitute two intervening acts by the juvenile

---

[4] We note that this court has found reasonable suspicion where, in addition to evasive behavior and a high crime area, there is other indication of criminal activity. *See Commonwealth v. Carter*, 105 A.3d 765, 774 (Pa. Super. 2014) (*en banc*), *appeal denied*, ___ A.3d ___ (Pa. June 17, 2015) (police had reasonable suspicion where defendant "was in a high-crime area, at night, with a weighted and angled bulge in his coat," "alerted to the officers' presence intentionally turned his body away from them, at least three times, to conceal the bulge," and "walk[ed] away from the known drug corner whenever the officer[s] passed by it"). *See also Commonwealth v. Foglia*, 979 A.2d 357 (Pa. Super. 2009) (*en banc*), *appeal denied*, 990 A.2d 727 (Pa. 2010) (reasonable suspicion found where there was an anonymous tip, evasive behavior in looking back and walking away, high crime area, and hand movements that police recognize as associated with the secreting of a weapon).

defendant which granted the police probable cause to seize the weapon." Commonwealth's Brief at 11, citing *Commonwealth v. Hall*, 929 A.2d 1202 (Pa. Super. 2007).

As the Commonwealth asserts, this Court, in *Hall*, expressly stated that "[e]ven when a police officer's initial stop or pursuit of an individual is not based upon either a reasonable suspicion of crime or probable cause, subsequent actions by the detainee during the encounter may be the basis for a lawful arrest and the subsequent denial of a suppression motion regarding evidence seized after the arrest." *Id.* at 1207.[5] Applying *Hall*, we find that D.X.P.'s behavior subsequent to the stop and pursuit supplied probable cause which allowed the officers to seize the handgun in question.

---

[5] *Citing* *Commonwealth v. Lynch*, 773 A.2d 1240, 1246–48 (Pa. Super. 2001) (holding that although the police lacked reasonable suspicion to initially pursue the appellant, the appellant's pointing a weapon at the police and subsequent abandonment of the weapon during the pursuit gave police probable cause to arrest the appellant, and the suppression court accordingly did not err by permitting testimony regarding the appellant's abandonment and the police officers' recovery of the weapon, even though the initial pursuit was without a reasonable basis or suspicion); *Commonwealth v. Britt*, 691 A.2d 494, 496–98 (Pa. Super. 1997) (holding that although the police lacked probable cause to initially detain the appellant, the appellant's subsequent flight, resisting arrest, and causing injury to one of the officers provided the police with probable cause to arrest the appellant, and, thus, the suppression court accordingly erred by suppressing evidence seized, even though the initial detention was made without probable cause).

We note that *Lynch* has been overruled on other grounds, as stated in *Commonwealth v. Foglia, supra*, 979 A.2d at 361 n.2.

Here, during the chase, D.X.P., a juvenile, brandished a firearm in violation of 18 Pa.C.S. § 6110.1 ("Possession of firearm by minor").[6] Because police observed him committing this offense, the officers had probable cause to arrest D.X.P. and seize the firearm.[7] Accordingly, the juvenile court did not err in denying the motion to suppress the firearm.[8]

Dispositional order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/10/2015

_____

[6] D.X.P. was 16 years of age at the time of the offense.

[7] We agree with the Commonwealth that "[h]ad the juvenile merely fled, or abandoned the clothing or bag containing a handgun without displaying its criminal nature, he may have avoided giving police additional probable cause." Commonwealth's Brief at 12.

[8] "This Court is not bound by the rationale of the trial court, and we may affirm the trial court on any basis." **Commonwealth v. Williams**, 73 A.3d 609, 617 n.4 (Pa. Super. 2013).