J-A31018-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellant | |
| v. | |
| JOJUAN ADAMS | |
| Appellee | No. 3365 EDA 2015 |

Appeal from the Order October 7, 2015
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0000254-2015

BEFORE:  BENDER, P.J.E., MOULTON, J., and FITZGERALD, J.[*]

MEMORANDUM BY MOULTON, J.:                    **FILED MARCH 06, 2017**

The Commonwealth of Pennsylvania appeals from the October 7, 2015 order entered in the Philadelphia County Court of Common Pleas granting Jojuan Adams' motion to suppress physical evidence.  Because we conclude that the arresting officer had reasonable suspicion that Adams and his companion were truant from school, we reverse the trial court's suppression ruling and remand for further proceedings.

On December 23, 2014, Adams was arrested and charged with various offenses related to his alleged possession of a firearm.  On February 3, 2015, Adams filed an omnibus pretrial motion, which included a motion to

---

[*] Former Justice specially assigned to the Superior Court.

suppress the firearm seized by police.[1]  On October 7, 2015, the trial court held a suppression hearing.

At that hearing, the Commonwealth's sole witness was Officer Mark Davis.  Officer Davis testified that around 12:30 p.m. on December 23, 2014, he was patrolling the 1500 block of 24th Street in Philadelphia,[2] in plain clothes and in an unmarked vehicle with three other officers, when he saw Adams riding on the handlebars of a bicycle operated by another male. N.T., 10/7/15, at 9-10.  Officer Davis stated that the two males[3] initially drew his attention because the male "operating the bicycle had a backpack on" and "[i]t was during school hours."[4]  *Id.* at 10.  Officer Davis pulled

_____

[1] Counsel of record filed this motion.  Adams also filed a *pro se* motion to suppress physical evidence on March 12, 2015.  However, because Adams was represented by counsel, "his *pro se* filing was a legal nullity." **Commonwealth v. Ruiz**, 131 A.3d 54, 56 n.4 (Pa.Super. 2015) (citing **Commonwealth v. Ellis**, 626 A.2d 1137, 1139 (Pa. 1993)).

[2] Officer Davis testified that this "specific area . . . is notorious . . . for narcotic sales and a high concentration of shooting incidents."  N.T., 10/7/15, at 17.  He further testified that he had patrolled that district for more than eight years and, in that time, had made over 100 gun arrests, 15 to 20 of which were in the neighborhood where the incident occurred.  *Id.* at 15.

[3] At the time of the incident, Adams was 19 years old and the operator of the bicycle was 17 years old.  N.T. at 35; Cmwlth.'s Br. at 6.

[4] On cross-examination, Officer Davis conceded that public schools may have had a half-day and that many charter and private schools may have been closed.  N.T. at 20.  When later asked by the suppression court why he initially focused on Adams and his companion, Officer Davis again explained "that they appeared to be young and it was during school hours." *Id.* at 23.
*(Footnote Continued Next Page)*

within 15 feet of the bicycle, which was in the middle of 24th Street and traveling southbound. *Id.* at 10, 13. He then saw the operator of the bicycle look back at the unmarked vehicle, lean toward Adams, and "whisper something." *Id.* at 14, 24-25. After turning eastbound onto the 2300 block of Greenwich Street, both Adams and the operator made motions towards their waistbands:[5]

> [COMMONWEALTH]: And when you said that you saw the defendant on the handlebars at first make the motion, can you just show the Court what, if anything you saw him do?
>
> [OFFICER DAVIS]: With his hand?
>
> [COMMONWEALTH]: Yes.
>
> [OFFICER DAVIS]: From my view, Your Honor—I was behind the defendant. He was riding on the bicycle like this (indicating).
>
> THE COURT: So you have your back towards me, as you said the defendant had his back towards you while you were in the vehicle.
>
> [OFFICER DAVIS]: Correct. Me being the defendant right now.
>
> He was just basically going like this (indicating), moving his elbow up and down, and directing his hand towards his waistband.
>
> [COMMONWEALTH]: And then you indicated that after that you saw the other individual who was actually riding the bicycle do the same thing, but with his left hand; is that fair?

*(Footnote Continued)* ───────────────────

[5] Officer Davis testified that "over 95 percent of the gun arrests [he] has made have been weapons without holsters that are concealed in the front waistband." N.T. at 15-16.

[OFFICER DAVIS]:   Correct.

*Id.* at 16.

Officer Davis then "initiated the lights on [his] unmarked vehicle and made a chirp sound with the siren." *Id.* at 11.  The operator of the bicycle rose off the seat and began to pedal faster.  *Id.*  One of the officers yelled for Adams and the operator to stop.  *Id.*  Both Adams and the operator disregarded the order.  *Id.*  The officer yelled again for the men to stop, at which point they turned northbound onto another street and ditched the bicycle, running in opposite directions.  *Id.* at 11-12.  Officer Davis pursued Adams on foot.  *Id.* at 12.  During this pursuit, Adams discarded a firearm onto the road, which Officer Davis retrieved before continuing the chase.  *Id.*  After chasing Adams for another two blocks, police captured him.  *Id.*

At the end of the hearing, the trial court granted the motion to suppress the firearm, concluding that police lacked reasonable suspicion to stop Adams and the operator of the bicycle based on the totality of the circumstances and Officer Davis's testimony.  *Id.* at 39-40.  On October 14, 2015, the Commonwealth filed a motion to reconsider, arguing that the trial court incorrectly found no reasonable suspicion to stop Adams for a possible firearms violation.  On October 21, 2015, the Commonwealth supplemented its motion, contending that there was also reasonable suspicion to stop

Adams for a truancy violation under the Public School Code.[6]  On October 28, 2015, after a hearing,[7] the trial court denied the motion to reconsider. The Commonwealth filed a notice of appeal on November 6, 2015, certifying that the suppression order terminates or substantially handicaps its prosecution.[8]  **See** Pa.R.A.P. 311(d).

The Commonwealth raises the following issue on appeal:[9]

_____

[6] Section 13-1341 of the Public School Code authorizes municipal police officers to "arrest or apprehend any child who fails to attend school in compliance with the [Code]."  24 P.S. § 13-1341(a), (c).

[7] The certified record does not contain any notes of testimony from this hearing.

[8] While the trial court did not order a concise statement of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(b), the Commonwealth filed such a statement on November 6, 2015.  The trial court did not file an opinion pursuant to Rule 1925(a).

After the trial court denied his petition for nominal bail or house arrest pending appeal, on January 14, 2016, Adams filed an application for bail with this Court.  On March 29, 2016, this Court ordered the trial court to prepare a statement of reasons for denying that petition pursuant to Pa.R.A.P. 1762(g).  The trial court filed its statement on April 21, 2016, which included a brief discussion of the facts surrounding the suppression motion without legal analysis.  This Court denied Adams' application on May 13, 2016.

[9] In its Rule 1925(b) statement, the Commonwealth also raised a coordinate jurisdiction issue regarding the denial of the bicycle operator's motion to suppress, which was adjudicated by the Family Court Division. However, because "the Commonwealth has been unable to confirm that the issue of coordinate jurisdiction was preserved in the court below," the Commonwealth has voluntarily abandoned this issue on appeal.  Cmwlth.'s Br. at 4.

Where an officer ordered [Adams] and his companion to stop because they: (1) appeared to be of school age and were riding a bike in the middle of the street during school hours; (2) were in a high-crime area; (3) adjusted their waistbands; and (4) turned onto a different street after seeing the officer; did the lower court err in suppressing a gun [Adams] discarded as he fled on the basis that police lacked reasonable suspicion to conduct a stop?

Cmwlth.'s Br. at 4.

The Commonwealth challenges the trial court's order granting Adams' motion to suppress. Our standard of review on such matters is well-settled:

When the Commonwealth appeals from a suppression order, this Court follows a clearly defined scope and standard of review. We consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. This Court must first determine whether the record supports the factual findings of the suppression court and then determine the reasonableness of the inferences and legal conclusions drawn from those findings. In appeals where there is no meaningful dispute of fact, as in the case *sub judice,* our duty is to determine whether the suppression court properly applied the law to the facts of the case.

***Commonwealth v. Arthur***, 62 A.3d 424, 427 (Pa.Super. 2013) (internal citations and quotation marks omitted).

The Commonwealth's lead argument on appeal is that Officer Davis was justified in stopping Adams because he had reasonable suspicion that Adams and his companion were truant under the Public School Code.[10]

_____

[10] At oral argument before this Court, the Commonwealth also asserted that Officer Davis possessed reasonable suspicion to stop Adams and his companion based on a possible violation of section 3504 of the Vehicle Code, which prohibits bicycle passengers from riding on the
*(Footnote Continued Next Page)*

According to the Commonwealth, Officer Davis possessed reasonable suspicion because he saw "two young men on the street at 12:30 in the afternoon, one of whom was wearing a backpack, at a time when school was generally in session."[11]  Cmwlth.'s Reply Br. at 2.

In response to the Commonwealth's truancy argument, Adams asserts that Officer Davis lacked reasonable suspicion because the incident occurred

_(Footnote Continued)_ _____

handlebars.  **See** 75 Pa.C.S. § 3504.  However, because the Commonwealth did not raise this issue in its brief, we decline to address it.  **See** Pa.R.A.P. 2116(a) ("No question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby."); **Commonwealth v. Pantalion**, 957 A.2d 1267, 1270 n.6 (Pa.Super. 2008) (finding waiver where appellant failed to support issue with argument or citation to authority) (citing Pa.R.A.P. 2119(a)).

[11] The Commonwealth also argues that the trial court erred in finding that Officer Davis lacked reasonable suspicion to stop Adams based on a firearm violation.  Specifically, it contends that the pre-seizure actions of Adams and his companion, including whispering to each other, turning onto a side street, and adjusting their waistbands, all in a high-crime area, combined to provide Officer Davis with reasonable suspicion that they were engaged in criminal activity.

Given our disposition of this case, we need not address this argument. Nevertheless, we note that the trial court rejected it based on a record that included a physical re-enactment by Officer Davis of the movements of Adams and his companion.  In particular, Officer Davis explained that because of his position behind the bicycle, he could only see the suspects moving their elbows up and down.  While the Commonwealth contends that such motions are indicative of concealing a weapon, and cites several cases in which "waistband adjustment" has supported a finding of reasonable suspicion, **see** Cmwlth.'s Br. at 10-11, those motions are in no way talismanic.  That is particularly so where, as here, the suppression court observes the officer's re-enactment of the motions in question, something that cannot be fully captured in a paper record on appeal.

on December 23, 2014 and the "Commonwealth failed to establish . . . that school was actually in session when the officers encountered [Adams] and his companion." Adams' Br. at 13. Adams argues that the Commonwealth's lynchpin case, *In re C.C.J.*, 799 A.2d 116 (Pa.Super. 2002), "only applies 'during a time when school was in session'" and because Officer Davis "did not think it was actually school hours," admitted that "many charter and private schools had the day off," and thought "Philadelphia public schools had a half day on that date[,] . . . . [t]he record does not actually support a finding that the two men were stopped during school hours." Adams' Br. at 13. (quoting *C.C.J.*, 779 A.2d at 121).

Adams also argues that the record is silent regarding Officer Davis's "subsequent assumptions regarding their age." *Id.* at 14. According to Adams, the fact that Officer Davis only testified that Adams and his companion's possible ages initially attracted his attention "leaves open the possibility that, after following them for a while, [Officer Davis] no longer suspected that the[y] might be truant because he got a better look at them or because he remembered the date." *Id.*

The investigation of possible criminal activity invariably brings police officers in contact with members of the public. Depending on the circumstances, a police-citizen encounter may implicate the citizen's liberty and privacy interests as embodied in both the federal constitution, *see* U.S.

Const. amend. IV,[12] and our state constitution, *see* Pa. Const. art. I, § 8.[13] The law recognizes three distinct levels of interaction between police officers and citizens: (1) a mere encounter; (2) an investigative detention, often described as a *Terry* stop, *see Terry v. Ohio*, 392 U.S. 1 (1968); and (3) a custodial detention. *See Commonwealth v. Jones*, 874 A.2d 108, 116 (Pa.Super. 2005).

"A mere encounter can be any formal or informal interaction between an officer and a citizen, but will normally be an inquiry by the officer of a citizen. The hallmark of this interaction is that it carries no official compulsion to stop or respond," *Commonwealth v. DeHart*, 745 A.2d 633,

_____

[12] The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

[13] Our Supreme Court has held that "the Fourth Amendment [of the United States Constitution] and Article I, [Section] 8 [of the Pennsylvania Constitution] are coterminous for *Terry* [*v. Ohio*, 392 U.S. 1 (1968)] purposes." *Commonwealth v. Chase*, 960 A.2d 108, 118 (Pa. 2008). Article I, Section 8, of the Pennsylvania Constitution provides:

> The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

636 (Pa.Super. 2000) (internal citations and quotations omitted), and therefore need not be justified by any level of police suspicion. ***Commonwealth v. Polo***, 759 A.2d 372, 375 (Pa. 2000). "In contrast, an 'investigative detention' . . . carries an official compulsion to stop and respond . . . . Since this interaction has elements of official compulsion it requires reasonable suspicion of unlawful activity." ***DeHart***, 745 A.2d at 636. Finally, "a custodial detention occurs when the nature, duration and conditions of an investigative detention become so coercive as to be, practically speaking, the functional equivalent of an arrest." ***Id.*** This level of interaction requires that the police have probable cause to believe that the person so detained has committed or is committing a crime. ***See Commonwealth v. Ellis***, 662 A.2d 1043, 1047 (Pa. 1995) (citing ***Dunaway v. New York***, 442 U.S. 200 (1979)).

Both Adams and the Commonwealth agree that when Officer Davis activated his lights, he initiated an investigative detention of Adams and his companion. ***See*** N.T. at 32-33. Therefore, we examine the facts and circumstances that existed at the moment Officer Davis activated his lights to determine whether he had reasonable suspicion to detain Adams. This Court has stated the following regarding reasonable suspicion:

> [T]o establish grounds for reasonable suspicion, the officer must articulate specific observations which, in conjunction with reasonable inferences derived from those observations, led him reasonably to conclude, in light of his experience, that criminal activity was afoot and that the person he stopped was involved in that activity. The question of whether reasonable suspicion existed at the

time [the officer conducted the stop] must be answered by examining the totality of the circumstances to determine whether the officer who initiated the stop had a particularized and objective basis for suspecting the individual stopped. Therefore, the fundamental inquiry of a reviewing court must be an objective one, namely, whether the facts available to the officer at the moment of the stop warrant a man of reasonable caution in the belief that the action taken was appropriate.

*Commonwealth v. Basinger*, 982 A.2d 121, 125 (Pa.Super. 2009) (internal citations and quotation marks omitted; alterations in original). If Officer Davis did not have reasonable suspicion, "then the contraband discarded by [Adams] during the chase are the fruits of an illegal seizure and subject to suppression." *In re M.D.*, 781 A.2d 192, 197 (Pa.Super. 2001) (internal quotation and citations omitted).

We conclude that Officer Davis possessed reasonable suspicion to detain Adams on a suspicion of truancy. In *C.C.J.*, we found that "police had the requisite reasonable suspicion that criminal activity was afoot in that they observed C.C.J., who appeared to be of school age youth, on a public street during a time when school was in session," and "the apparent age of C.C.J. was sufficient to warrant the investigatory detention." 799 A.2d at 121. Here, although Officer Davis was unsure whether all schools were open at the time of the stop, the record establishes that he believed that Adams was of school age and on public streets while school may have been in session. N.T. at 10, 13, 20. While it is true that some schools may have

been closed on December 23 for the winter holiday,[14] reasonable suspicion does not require certainty. Considering that "the level of suspicion [required to instigate a *Terry* stop] is considerably less than proof or wrongdoing by a preponderance of the evidence," *United States v. Sokolow*, 490 U.S. 1, 7 (1989), and "*Terry*, by its very nature, 'accepts the risk that officers may stop innocent people,'" *Commonwealth v. Carter*, 105 A.3d 765, 769 n.4 (Pa.Super. 2014) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 126 (2000)), we conclude that Officer Davis possessed reasonable suspicion to believe that Adams and his companion were truant and, therefore, could briefly stop them to determine if whether they were of mandatory school age and, if so, whether their schools were in session that day.[15]

_____

[14] Adams' counsel argues that because the day in question was two days before Christmas, the Commonwealth was required to present evidence that school was open that day. However, that is not the standard by which we measure reasonable suspicion. Rather, we consider the totality of the circumstances, "namely, whether 'the facts available to the officer at the moment of the [intrusion] warrant a man of reasonable caution in the belief' that the action taken was appropriate." *Commonwealth v. Zahrir*, 751 A.2d 1153, 1156 (Pa. 2000) (quoting *Terry*, 392 U.S. at 21-22)).

We also note that, though it is not in the record, Philadelphia Public Schools were in session on December 23, 2014. *See* School Year Calendar: 2014-2015, http://www.philasd.org/calendar/2014_2015/ (last visited Jan. 30, 2017).

[15] Adams also contends that the Commonwealth cannot use truancy as a basis for reasonable suspicion because Officer Davis stopped Adams with a gun violation in mind. Adams' Br. at 13-14. However, we examine reasonable suspicion through an objective lens that discards the officer's subjective intent. *Commonwealth v. Foglia*, 979 A.2d 357, 361 (Pa.Super. 2009) (quoting *Maryland v. Macon*, 472 U.S. 463, 470-71

*(Footnote Continued Next Page)*

Because Officer Davis had reasonable suspicion to stop Adams when he activated the lights on his vehicle, we conclude that Adams did not abandon the firearm in response to illegal police conduct. Therefore, the trial court should not have suppressed the firearm. *See Commonwealth v. Ibrahim*, 127 A.3d 819, 825 (Pa.Super. 2015), *app. denied*, 138 A.3d 3 (Pa. 2016).

Order reversed. Case remanded. Jurisdiction relinquished.

President Judge Emeritus Bender joins in the memorandum.

Justice Fitzgerald concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/6/2017

*(Footnote Continued)* ————————————

(1985)) (noting that Fourth Amendment inquiries "turn on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time," rather than "the officer's actual state of mind at the time the challenged action was taken").